(C. D. 1053)

J. D. RICHARDSON Co. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided May 21, 1947)

*Eugene R. Pickrell* for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Howard L. Harawitz,* special attorney), for the defendant.

Before CLINE and EKWALL, Judges

EKWALL, Judge: This case involves the amount of duty properly assessable upon 16 importations totaling 16,971 tank idler wheel rims returned to the United States after having been shipped by the Kelsey-Hayes Wheel Co. of Detroit, Mich., to its Canadian plant in order that they might have a flange turned thereon. There is no dispute as to the appropriate rate of duty to be applied to these articles, viz, 27½ per centum ad valorem under the provisions of paragraph 372, Tariff Act of 1930, which is the rate assessable on parts of machines. The question for determination is whether this rate should be applied to the article in its condition as returned, as found by the customs officials, or whether such rate should be applied only to the value of turning a flange upon each of the rims at the

Canadian plant, as claimed by the agent of the Kelsey-Hayes Wheel Co., the exporter and the ultimate consignee of said rims. Plaintiff's claim is based on the provisions of paragraph 1615, Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, and specifically upon subparagraph (g) thereof which provides that upon the return of an article exported for repairs or alterations duty at the appropriate rate shall be assessed upon the value of such repairs or alterations. It is the contention of plaintiff that the turning of a flange on the articles exported constitutes an alteration within the meaning of the statute.

At the trial of the case the following stipulation was entered into by counsel:

It is hereby stipulated and agreed by and between the attorneys for the parties herein, subject to the approval of the Court, that since the Collector of Customs prohibited the importer herein from making entry under the provisions of paragraph 1615 (g) of the Tariff Act of 1930 on the value of the operations in Canada of the importations covered by this protest, and since the importer advised the Collector he intended to file protest, and in order that the importer not be precluded from the possibility of compliance with the filing provisions of Section 10.8, of the Treasury Regulations of 1943, the Collector of Customs permitted the importer to file certificates of registration on Customs form 4455 and certificates of exportation on Customs form 4467 and declarations on the form provided for in paragraph (f) Section 10.8 of the Customs Regulations of 1943, which certificates and declarations appear in the record herein.

It is further stipulated and agreed that certificates of registration on Customs form 4455 were timely filed prior to exportation of all the importations covered by this protest.

It is further stipulated and agreed that these Customs forms 4455 now appearing in the record be deemed part of the record.

It is further stipulated and agreed that as to the articles exported for which no certificates on Customs form 4455 now appear in the record such certificates were filed with the Collector and no returns were made thereon, and that as to these articles on which certificates of exportation on Customs form 4467 were filed such certificates now appearing in the record be deemed part of the record.

It is further stipulated and agreed that the declarations provided for in paragraph (f), Section 10.8, Customs Regulations of 1943, were filed in connection with each entry covered by this protest and that said declarations now appearing in the record be deemed part of the record.

It is further stipulated and agreed that the articles covered by this protest are the articles which were originally exported to Canada for processing, and which were there processed.

It is further stipulated and agreed that the value of the operations or processing in Canada per article of the articles covered by this protest as determined in accordance with the provisions of Section 402 (f) of the Tariff Act of 1930 is $2.42891 Canadian funds, subject to this Court's jurisdiction in this proceeding to find the value of said operations or processing.

Government counsel then stated that he had entered into a further agreement with counsel for the plaintiff as follows:

It is further stipulated and agreed that in connection with the Customs forms 4455 and 4467 which are deemed part of the record as provided herein, the defendant does not accept as correct the description of the articles as therein contained.

This stipulation in its entirety was approved by the judge who heard the case on circuit and was admitted as part of the record.

We quote the applicable provisions of the statute and the regulations, so far as pertinent.

The Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, in the free list thereof, provides as follows:

PAR. 1615. (a) Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means.

\* \* \* \* \* \* \*

(g) Any article exported from the United States for repairs or alterations may be returned upon the payment of a duty upon the value of the repairs or alterations at the rate or rates which would apply to the article itself in its repaired or altered condition if not within the purview of this subparagraph.

(h) The allowance of total or partial exemption from duty under any provision of this paragraph shall be subject to such regulations as to proof of identity and compliance with the conditions of this paragraph as the Secretary of the Treasury may prescribe.

The Customs Regulations of 1943, so far as pertinent to the issue herein, provide as follows:

10.8 **Articles exported for repairs or alterations.**—(a) For the purposes of paragraph 1615 (g), Tariff Act of 1930, as amended, the term "repairs or alterations" shall be held to mean any restoration, change, addition, renovation, cleaning, or other treatment which does not destroy the identity of the article exported or create a new or different article.

(b) Prior to the exportation of articles to be subject to duty on the value of repairs or alterations made abroad, as provided for in paragraph 1615 (g), an affidavit and application in duplicate on customs Form 4455 shall be filed with the collector of customs a sufficient length of time before the departure of the exporting conveyance to permit the examination of the articles.

(c) The owner or exporter shall be notified on customs Form 4455 to deliver the articles to the place designated by the collector for examination. All expense in connection with the delivery of the articles, cording, sealing, and transfer to the exporting vessel or conveyance shall be borne by the exporter. Photographs or other means of identification shall be furnished appraising officers when required.

\* \* \* \* \* \* \*

(f) If at the time of return the value of the articles in their repaired or altered condition exceeds $100, there shall be filed in connection with the entry an invoice showing separately the value of the articles in their repaired or altered condition and the cost or value of the repairs or alterations. This invoice, whether or not required to be certified by an American consul, shall have attached a declaration of the person in the foreign country who made the repairs or alterations, which declaration shall be certified in the same manner as a consular invoice. This declaration shall be in substantially the following form:

\* \* \* \* \* \* \*

(i) Collectors shall require at the time of entry a deposit of estimated duties based upon the value of the repairs or alterations and shall order all packages containing such articles to the appraiser's stores for identification of the articles and appraisement of the values of the articles and of the repairs or alterations.

\* \* \* \* \* \* \*

Nine exhibits were offered by the plaintiff and received in evidence. Exhibit 1 is a photograph of what is described as the rim for the T-26 tank, such as was shipped to the Kelsey-Hayes Wheel Co. of Windsor, Ontario, showing the article to be a piece of metal with the ends welded together. The process of manufacture of such an article in the McGraw plant in Detroit, Mich., of the Kelsey-Hayes Wheel Co., was described by plaintiff's witness Mr. McGibboney as follows:

The material is purchased in strip form from various steel mills. Our first operation consists of a pickling operation to remove the scale and rust from the surface. In the second operation we sheared it to length, developed length. The third operation consisted of coiling. In the fourth operation we straightened the ends for the welder operator. In the fifth operation we bumped the ends together. The sixth consisted of loading that rim onto a rack for the welder operator. Then in the seventh operation we welded the rim together. The eighth operation, we burr cut the rim. The ninth operation we trimmed the edges by grinding. The tenth operation we ground the o. d. of the wheel. The eleventh operation we ground the i. d. of the wheel. The twelfth operation we expanded to size. The thirteenth and final operation was an inspection operation.

Exhibit 2 is a blueprint of the specifications of the United States Ordnance for the article shown on exhibit 1, after the flange operation had been performed. Exhibit 3 is a steel plate, being a cross-section of exhibit 1. Exhibit 4 is a photograph of exhibit 1 after the flange had been turned, and represents the articles in suit. Exhibit 5 is a steel plate, a cross-section of exhibit 4. Exhibit 6 is a photograph of the wheel as delivered to the Fisher Body Division of General Motors Corporation, containing as a part thereof the articles represented by exhibits 1 and 4. Exhibit 7 consists of a cross-section of an assembly wheel of a T-26 or M-26 tank, containing as a part thereof the article represented by exhibit 4. Exhibit 8 is a diagram of the operations performed in turning the flange on exhibit 1. Illustrative exhibit 9 is a photograph of a tank, the M-26 known as the General Pershing tank, in the construction of which exhibit 4 is a part.

The plaintiff produced the testimony of three witnesses and one witness testified on behalf of the defendant.

The general foreman of the rim division in the Detroit plant of the Kelsey-Hayes Wheel Co., who supervised the manufacture of all rims produced therein; the die repairman of the plant who supervised dies and tools at the Windsor, Ontario, plant of the Kelsey-Hayes Wheel Co. and who had supervised all the stamping operations in that plant, including the operations by means of which exhibit 1 was changed into exhibit 4; and the chief of the tool design division at the company's Windsor plant testified on behalf of the plaintiff. The Government's witness consisted of the resident Army Inspector of Ordnance at Flint, Mich., in charge of the inspection of the T-26 or M-26 tank, who passed upon wheel assemblies.

From the evidence adduced it is clear that the flange was desirable upon these articles for the purpose of adding strength to the wheel

assembly and as a protection to the rubber tires; that said flange was turned up from a portion of the article as shipped to Canada and was not an addition welded to it; that in Canada three press operations undertaken to form the flange, resulted in a change in form, as shown in exhibit 4; and that upon the return of the article to the United States, the only additional work done upon it was one of cleaning. In order to manufacture the complete wheel assembly, 23 additional operations were necessary before installation of the rubber tire. According to the testimony of plaintiff's witnesses, the article in its condition as exported to Canada and as returned to the United States was incapable of any use except as part of tank wheel assemblies for the T–26 or M–26 tanks and all of the processes undertaken were steps in the ultimate manufacture of a completed tank wheel.

Counsel for the Government moved to dismiss the protest upon the ground that plaintiff had failed to make out a *prima facie* case. Decision on the motion was reserved for the division of the court deciding the case. The motion is hereby denied.

The Government's witness testified that the flange was turned upon the article for the purpose of strengthening the wheel assembly. He was of the opinion that the article represented by exhibit 1, which was shipped to Canada, was not a rim. However, he stated that the pieces of steel bands without a flange served the purpose of rims.

During the course of the trial, testimony of the witnesses on behalf of the plaintiff as to what descriptive term would be used by them in describing the article exported to Canada was excluded, and decision on the motion of counsel for the plaintiff to strike from the record that portion of the testimony of the Government witness wherein he stated the term he would apply in describing exhibit 1, was reserved for this division. It is the opinion of the court and we so hold that such evidence is admissible. The witnesses were fully qualified by reason of their experience and training to state their opinion as to the designation of the article, both in its condition as exported to Canada and as returned to this country. No question of commercial designation is involved and testimony as to the common meaning of a term, while advisory only, may be of great aid to the court.

In the case of *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 C. C. P. A. (Customs) 24, C. A. D. 209, at page 30, the court said:

* * * The meaning of a word may be ascertained with perfect propriety by the judge called upon to determine such meaning, by examining the lexicographical and technical authorities, and he may seek aid from the testimony of competent witnesses.

In the case of *United States* v. *Astra Bentwood Furniture Co.*, 25 C. C. P. A. (Customs) 340, T. D. 49434, we find the following:

* * * Testimony as to the common meaning of a term is, of course, not binding upon the courts but may be looked to by them as advisory and may be

accorded such weight as the courts deem proper in connection with the definitions of such terms given by the lexicographers.

In the same volume, at page 296, in the case of *United States* v. *Florea*, T. D. 49396, we find the court using this language:

At this point it may be observed that in cases like the one at bar, courts may give consideration to, and often are aided by, the testimony of competent witnesses with reference to the common meaning of a term when applied to the particular merchandise under consideration. It is well settled, however, that courts are not, under such circumstances as are at bar, bound by such testimony, but will ordinarily chiefly rely upon decisions of the courts and upon the definitions found in dictionaries and other lexicographical authorities. *F. W. Myers & Co. (Inc.)* v. *United States*, 16 Ct. Cust. Appls. 171, T. D. 42794.

In the instant case it has been agreed that all of the regulations attending the entry of merchandise exported for repairs or alterations have been complied with. Counsel have also agreed upon a value for the operations or processing in Canada of the articles in suit, as determined in accordance with the provisions of section 402 (f) of the Tariff Act of 1930. This agreement was made subject to the jurisdiction of this court in this proceeding to find said value. Inasmuch as that is a matter of appraisement, we have no jurisdiction either to accept or reject this value. *Midland Linseed Products Co. et al.* v. *United States*, 10 Ct. Cust. Appls. 101, T. D. 38361. The question before us is whether the work performed upon the article shipped to Canada falls within the common meaning of an alteration under paragraph 1615 (g), *supra*.

Plaintiff contends that the turning of the flange on the rim is an alteration within the meaning of that term as used in statute and in section 10.8 of the Customs Regulations of 1943. Alternatively, it is contended that the Secretary of the Treasury, under the provisions of paragraph 1615 (h), *supra*, had no authority to establish a definition of the word "alterations," inasmuch as the statute merely authorizes regulations as to proof of identity and compliance with the conditions of the paragraph.

The Government in its brief makes the following contentions:

1. Subdivisions (a) and (g) of paragraph 1615 of the Tariff Act of 1930, as amended, must be considered together and given a consistent and harmonious construction and operation.

2. As a result, the exported articles, of American origin, advanced in value and improved in condition by the flanging process which constituted the ultimate steps in the manufacture of the completed article in accordance with ordnance specifications, should be assessed with duty at their full value by virtue of subdivision (a) rather than on the value of the work done in Canada under subdivision (g) inasmuch as such process of manufacture does not constitute an alteration within the purview of subdivision (g) or as defined in Section 10.8 (a) of the Customs Regulations of 1943.

3. The language of subdivision (h) of paragraph 1615 of the Tariff Act of 1930, as amended, is sufficiently broad to justify the promulgation by the Secretary

of the Treasury of subdivision (a) of Section 10.8 of the Customs Regulations of 1943.

Counsel for the plaintiff in support of his claims relies upon the case of *Emery* v. *United States*, 71 Treas. Dec. 880, T. D. 49000. That case involved chuck bushings which were imported from Canada for the purpose of being chromium-plated. Attempt was made to enter the same under section 308 of the Tariff Act of 1930, under bond for their exportation within 6 months, as "machinery or other articles to be altered or repaired." The customs officials were of the opinion that chromium-plating was a step in the manufacture of the bushings and did not come within the meaning of an alteration or repair. The court held the action of the collector in rejecting the entry under said section 308 was in error and in the course of its decision used the following language:

* * * There is nothing in the law which would indicate that the word "altered" contemplates confining its scope to any particular kind of change made in an article or to any definite purpose for which such change may be made. The term, as we view it, is designed to cover changes which are not in the nature of repairs. Necessarily the words "to be altered" would cover changes which are not in the nature of repairs. It would seem that the Congress out of an abundance of caution used both terms to insure any possible change made in an article.

Webster's New International Dictionary thus defines the word "alter":

1. To make otherwise; to change in one or more respects, but without destruction of the identity of the thing changed; to make (a thing) different without changing it into something else; to vary; to modify; sometimes, to change in any way.

\*       \*       \*       \*       \*       \*       \*

* * * If the word "alter" means to "change," and the dictionaries so define it, we know of no authority, statutory or otherwise, which empowers the collector to restrict or limit the nature or purpose of the change. If the word "alter" does not mean to change, then why was it used? * * *

On the facts and the law, we therefore hold that the collector erred in rejecting the proffered entry made under said section 308, and that the imported chuck bushings are properly entitled to free entry thereunder, as alleged by the plaintiffs. * * *

Also cited is the case of *Hillhouse* v. *United States*, 152 Fed. 163, in which Judge Lacombe, writing the opinion of the Circuit Court of Appeals, held, in the case of an automobile taken abroad and repaired, that so much of the machine as was a new manufacture, was dutiable, but when the value of such new manufacture is easily determinable, there is no good reason for exacting duty upon the article itself. New parts had been substituted, the motor had been overhauled, and the body repaired and newly upholstered. So much of the machine as was not repaired was admitted free as effects of persons from foreign countries, used by them not less than 1 year.

Counsel for the Government cites the case of *Burritt Lumber Sales Co., Inc.* v. *United States*, 4 Cust. Ct. 376, Abstract 43089. That

case was decided on the ground that the customs regulations had not been complied with. It is therefore not applicable to the situation before us.

The change in the statute by the addition of the term "alterations" in connection with paragraph 1615 (g) was discussed by the court in the case of *Greene* v. *United States*, 13 Cust. Ct. 273, Abstract 49676. In that case the claim under paragraph 1615 (g), *supra*, was overruled because of noncompliance with regulations of the Secretary of the Treasury. However, in its discussion of the merits, the court stated:

\* \* \* The common meaning of "alterations" implies that an article altered may become different in some respects, without there being an entire change. While, under the paragraph before amendment, the supplying of new parts to an article may be regarded as something more than a repair (see *Meyrowitz* v. *United States*, Abstract 40598), under the law as amended, clearly new additions are contemplated so that an article may be made different from that exported in some particular so long as it has not been converted into something else. The alterations made to the ring in question, according to the law under which it was entered, are not of such nature as to preclude its identity under the provisions of paragraph 1615.

\*        \*        \*        \*        \*        \*        \*

The decisions cited and relied upon by the Government involve claims under subparagraph (a) of paragraph 1615, *supra*, or corresponding paragraphs of former acts, and therefore have no application to the issue herein.

The case of *Jones* v. *United States*, 65 Treas. Dec. 169, T. D. 46877, was also cited. The plaintiff therein had taken with her when she went abroad a platinum chain containing eight diamonds, together with certain other pieces of jewelry containing diamonds. While abroad the chain had been set with 10 additional diamonds which had been removed from some of the other jewelry. Upon the return of the plaintiff to the United States the chain was assessed for duty upon its entire value. Plaintiff claimed that duty should have been taken upon the cost of the repairs only, as the chain was free of duty as personal effects of returning residents under paragraph 1798 of the Tariff Act of 1930. The court sustained the claim upon a finding that a platinum and diamond chain had been exported and that a platinum and diamond chain had been returned, although improved in condition. It therefore held that duty was assessable on the diamonds which had been added to the chain and on the repair charges connected therewith. In the course of its opinion the court held that regulations excluding from exemption under the section such articles as were repaired beyond the point necessary to restore them to their original condition, transcended the authority granted by Congress to establish the identity of the articles.

Paragraph 1615 here in issue grants exemption from duty to a variety of merchandise which would be subjected to duty were it not for such

exemption. This privilege is subject to regulations of the Secretary of the Treasury as to proof of identity and compliance with the conditions of the paragraph. Subparagraph (a) thereof grants exemption to articles which are the growth, produce, or manufacture of the United States, when returned after having been exported, provided such articles have been returned without having been advanced in value or improved in condition. Subparagraph (g), with which we are here concerned, provides that any article exported from the United States for repairs or alterations may be returned upon the payment of duty only upon the value of the repairs or alterations, the rate being fixed as that which would ordinarily be applicable to the article in its repaired or altered condition. It is manifest from the language of the two paragraphs that they are entirely independent of each other. Moreover, subparagraph (g) is not limited to American goods returned but applied equally to both domestic and foreign articles shipped from the United States for repairs or alterations and returned. It needs no strained construction to conclude that an article which has been shipped abroad for repairs or alterations would not be returned to the United States without having been advanced in value or improved in condition.

Prior to the time of the passage of the Customs Administrative Act of 1938 this court determined the meaning Congress intended to apply to the word "altered." (See *Emery* v. *United States, supra*.) Where a court of competent jurisdiction settles and judicially defines the common meaning of a term used in the statute, such adjudication becomes matter of law. When such determination has been made, the same will be adhered to until a legislative change in the statute necessitates a change in meaning. *United States* v. *Ben Felsenthal & Co. et al.*, 16 Ct. Cust. Appls. 15, T. D. 42713. Under the ruling in the *Emery* case, *supra*, and in view of the construction placed upon the term "alterations" in *Greene* v. *United States, supra*, it is clear that the word is used to indicate changes which are not in the nature of repairs and includes the processes applied to the articles here in suit.

The Government quotes the definition of the word "alteration" as found in Corpus Juris Secundum and the statement therein that the word implies the previous existence of the thing altered and that "it does not contemplate initial construction or installation of that which has no existence but a modification or change of that already constructed or installed." In line with this definition, Government counsel contends that the article contemplated in the case before us is a completed flanged rim which was not in existence at the time the Kelsey-Hayes Wheel Co. exported such articles to Canada and that the processing thereof in Canada constituted a completion process and not an alteration.

In order to aid us in deciding the question of whether the article in its condition as exported constituted a rim, as that term has been defined, we have had recourse to the definitions of some of the leading lexicographers.

Webster's New International Dictionary, 1939 edition, gives the following definition:

*rim*, n. 1. The border, edge, or margin, of a thing, usually of something circular or curving; as, the *rim* of a basin, a hat, a shield, the horizon, the sea.

Funk & Wagnalls New Standard Dictionary, 1941 edition, defines the word as:

*rim*, n. 1. The edge of an object, especially when circular, or when raised or projecting; a margin, border, or edging; as, the *rim* of a hat; a kettle-*rim*. 2. Specif.: (1) The peripheral part of a wheel; in a locomotive-wheel, a ring between the spokes or plate and the tire; in a wooden wheel, technically, the curved part under the tire, especially when made in one or two pieces. Compare FELLY. (2) The frame of a pair of spectacles or an eye-glass surrounding the lens. (3) The ratchet-ring of a capstan.

Webster's Collegiate Dictionary, Fifth Edition, 1938, states:

*rim*, n. 1. The border, edge, or margin of a thing, usually of something circular or curving. 2. The outer part of a wheel joined to the hub by the spokes; specif., a removable outer band on an automobile wheel, to which the tire is attached.

Under these definitions the articles shipped to Canada were rims of wheels upon which a flange was to be turned. The identical article that was exported was returned changed in condition by the turning of a flange in order to make it adaptable for the production of a wheel for the heavy General Pershing tank. It was not a mere piece of metal which was to be so processed as to result in the production of a rim, but was a rim upon which a flange was to be turned in order to make it suitable for use on a tank wheel.

We have given careful consideration to the legislative history of the paragraph here involved, as set forth in the brief of counsel for the Government, and the statements of the General Counsel of the Treasury Department before the Ways and Means Committee, the substance of which was that the law then in effect resulted in hardship in the case of articles upon which duty had once been paid which must be returned to the country of exportation for such adjustment or alterations as were necessary in order to adapt them for their intended use, in that upon their return they were assessed with full duty. As examples of this class of articles, footwear and artificial limbs were cited. However, it is interesting in this connection to note that Congress, in accepting the suggestion that the term "alterations" be added to "repairs" in the paragraph involved, made no change in the language thereof which would limit its scope to foreign merchandise.

This would indicate that it intended the paragraph to have a broader application than that suggested by the Treasury Department.

In view of our holding, we find it unnecessary to discuss plaintiff's alternative claim that subsection (*a*) of section 10.8, Customs Regulations of 1943, above set forth in which the term "alterations" is construed, is beyond the scope of the authority of the Secretary of the Treasury. However, it may not be amiss to note that such construction, although in conformity with the decisions, could have no binding effect upon the court and undoubtedly is intended as an aid to customs officials.

For the reasons above set forth, we hold the plaintiff's claim that duty should be assessed only upon the value of the alterations made to the rim exported, upon its return to the United States, should be and the same hereby is sustained.

Judgment will be rendered accordingly.